**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

|  |  |
|---|---|
| CHRISTINA FEARING, | CASE NO. 3:25-CV-01973-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION & ORDER** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

## INTRODUCTION

Plaintiff Christina Fearing challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On September 17, 2025, this matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of Sept. 17, 2025). The parties then consented to my exercising jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #13). For the reasons below, I **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Ms. Fearing applied for DIB in April 2022, alleging she became disabled on March 14, 2022 due to migraines, celiac disease, anxiety, bipolar disorder, Crohn's disease, attention deficit hyperactivity disorder (ADHD), back issues, neck issues, and blood issues. (Tr. 317; *see also* Tr. 642). After her claim was denied on initial review and reconsideration, Ms. Fearing requested a hearing before an administrative law judge. (Tr. 191, 204, 220). On July 23, 2024, Ms. Fearing (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 46-69). On

1

August 16, 2024, the ALJ determined Ms. Fearing was not disabled. (Tr. 17-36). On July 25, 2025, the Appeals Council denied Ms. Fearing's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. § 404.981). Ms. Fearing timely filed this action. (ECF #1). Relevant to one of her alleged errors, Ms. Fearing previously applied for DIB in 2019 and was found not disabled in February 2021. (*See* Tr. 178).

FACTUAL BACKGROUND

## I.      Personal and Vocational Evidence

Ms. Fearing was 44 years old on the application date and 45 years old at the hearing. (*See* Tr. 177). She has a GED, completed one year of college, and is certified as a State Tested Nurse Aide (STNA). (Tr. 50, 643). She has past relevant work as an auto parts inspector and a STNA. (Tr. 64, 627).

## II.     Relevant Medical Evidence

Ms. Fearing's medical records span more than 1,500 pages and document treatment for multiple medical conditions between February 2021 and July 2024. For clarity and ease of analysis, I present that evidence in groups of similar or interrelated medical conditions.

### A.      Musculoskeletal and Neurological Medical Impairments: knee, hip, spine and neck pain; arthralgias; and headaches

In March 2021, Ms. Fearing hurt her right knee. (Tr. 1870). During her appointment with orthopedist George Stepanic, D.O., she described constant discomfort, swelling, limited range of motion, and some instability. (Tr. 1871). An MRI showed partial tearing of the anterior and medial cruciate ligaments and an osseous contusion on the tibia. (Tr. 1025). She was referred for physical therapy. (Tr. 1870). On April 5, she received an injection of methylprednisolone into the

2

knee to decrease inflammation.[1] (Tr. 1874). Her knee pain returned two days after the injection. (*See* Tr. 1878). Later that month, Ms. Fearing described continued pain affecting her ability to perform daily activities. (Tr. 1878). She underwent a right-knee arthroscopy on May 14, during which the surgeon excised pathologic plica tissue from the medial patellofemoral joint. (*See* Tr. 1887). Twelve days after surgery, Ms. Fearing reported some tightness without instability. (*Id.*). Physician Assistant Matthew Meyer noted trace effusion, peripatellar tenderness, and tightness on terminal flexion. (Tr. 1888).

In June 2021, Ms. Fearing reported an improved range of motion in her knee and mild discomfort with prolonged walking. (Tr. 1890). Physical examination showed tenderness to the medial knee and medial tibial plateau, stable ligaments, and full range of motion with some tightness and soreness on flexion. (Tr. 1891). Ms. Fearing returned to work in June and was discharged from physical therapy for nonattendance in July. (Tr. 1001).

In August, Ms. Fearing's primary care physician documented diminished strength in her right leg and left hand and diminished patellar reflexes. (Tr. 1368). In September, she reported intermittent knee pain that was worse with squatting, kneeling, and prolonged activity. (Tr. 1893). She walked normally, and a physical examination noted normal knee alignment, peripatellar tenderness with patellar grind and patellofemoral crepitus, and tenderness at the medial and lateral joint lines. (Tr. 1895). In October, she reported continued discomfort with prolonged activity, sitting, and squatting. (Tr. 1897). On physical examination, PA Meyer noted an absence of ecchymosis, effusion, erythema, or swelling, but documented tenderness and pain at the medial

---

[1] Methylprednisolone is a corticosteroid used to relieve inflammation and treat certain forms of arthritis. *Methylprednisolone, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a682795.html (last accessed Aug. 11, 2026).

joint line. (Tr. 1900). Ms. Fearing had full range of motion but could not perform a deep squat or duck-walk secondary to pain and favored her right knee. (*Id.*). PA Meyer assessed unilateral primary osteoarthritis of the right knee and ordered a repeat MRI that showed intact tendons and ligaments with trace effusion in the joint. (Tr. 1897, 1901).

In November 2021, Ms. Fearing reported continued knee discomfort. (Tr. 1903). A physical examination showed peripatellar and medial joint line tenderness with a mildly positive patellar grind. (Tr. 1905). She received the first of three injections to treat the peripatellar symptoms then and received the second and third injections later that month. (Tr. 1902, 1906, 1909). The injections provided some relief and she had less tenderness at the medial joint line. (Tr. 1909).

In May 2022, Ms. Fearing reported soreness and pain in her right knee with minimal swelling, new left-knee pain, and difficulty with stairs. (Tr. 1912). A physical examination showed normal alignment and range of motion, stable ligaments, crepitus, peripatellar tenderness to palpation, patellar grind, and an abnormal gait. (Tr. 1914). PA Meyer recommended another series of injections and provided the first injection that day. (Tr. 1911). Ms. Fearing returned for a second injection in October 2022 and reported constant soreness that was worse with activity and climbing stairs. (Tr. 1916). Physical examination findings were similar to the findings in May 2022. (Tr. 1917; *compare* Tr. 1914). She completed the third injection in November. (Tr. 1918).

In December 2022, Ms. Fearing returned to her orthopedist and described constant knee discomfort that worsened with activity. (Tr. 1921). A physical examination showed patellar grind, tenderness to deep palpation over the patella, full range of motion, and stable ligaments. (Tr. 1924). An x-ray showed a varus deformity with narrowing of the medial joint line with evidence of

flattening of the articular surfaces to the medial tibial plateau and medial femoral condyle, evidence of subchondral sclerosis of the medial joint line and patellofemoral joint, and marginal osteophytes. (Tr. 1921). Dr. Stepanic diagnosed patellar tendinitis, prescribed Tramadol and Tylenol for pain, and recommended using a patellar tendon strap during increased activity.[2] (*Id.*). An updated MRI showed a small cystic lesion near the tibiofibular joint but otherwise intact menisci and ligaments. (Tr. 1929-30). In March 2023, she received methylprednisolone to decrease inflammation in the knee. (Tr. 1931).

In April 2023, Ms. Fearing injured her right hip while helping a patient transfer. (Tr. 1936). She reported her knee pain was better than before the arthroscopy but complained of right-hip pain. (Tr. 1935). On examination, she had tenderness at the right greater trochanter and Dr. Stepanic noted a slightly antalgic gait. (Tr. 1938). Dr. Stepanic provided another round of methylprednisolone to decrease the inflammation. (Tr. 1935). Later that month, her primary care physician prescribed Norco for hip pain because the Tramadol was not providing relief.[3] (Tr. 1673). In June, Ms. Fearing still had hip achiness, worse with movement, that radiated to the right buttock and down the back of her leg. (Tr. 1940). Dr. Stepanic noted a positive right straight-leg-raise test and an antalgic gait. (*Id.*). A lumbar x-ray dated December 2022 showed mild loss of disc space in the thoracolumbar region with sclerosis involving the posterior elements of the lumbar spine and sacroiliac joints. (*Id.*). The doctor determined she had mild arthritis. (*Id.*). Later that month, Ms. Fearing described worsening pain, grinding, and instability. (Tr. 1942). She walked

---

[2] Tramadol is a narcotic used to relieve severe and persistent pain. *Tramadol, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a695011.html (last accessed Aug. 11, 2026).

[3] Norco is the brand name for a combination drug containing hydrocodone and acetaminophen and is used to relieve severe pain. *Hydrocodone Combination Products, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a601006.html (last accessed Aug. 11, 2026).

with a limping, antalgic gait, and a physical examination suggested impingement in the hip. (Tr. 1944-45). PA Meyer ordered another MRI to evaluate a possible labral tear or impingement. (Tr. 1946). Ms. Fearing reported "good relief" but "continued mild achiness" after a hip injection in July 2023. (Tr. 1947). She had greater trochanter tenderness, a painful range of motion, positive hip-impingement test, and she walked with a limping, antalgic gait. (Tr. 1949). She received another hip injection in October to decrease inflammation. (Tr. 1958). In December, Ms. Fearing described 40% relief after the hip injection, but her hip symptoms returned, including dull achiness with intermittent sharp pains and occasional muscle cramps. (Tr. 1959). She received methylprednisolone to decrease inflammation. (Tr. 1962).

Later in December, PA Meyer administered an injection in her left knee to address symptoms and findings similar to the right knee. (Tr. 1967-69). In January 2024, Ms. Fearing reported some relief in her left knee but described intermittent discomfort with activity. (Tr. 1970). Dr. Stepanic assessed internal derangement of the left knee and scheduled her for a left knee arthroscopy. (Tr. 1973-74).

In February 2024, Ms. Fearing reported no relief in her hip after taking methylprednisolone in December. (Tr. 1975). She described similar symptoms as she did in December. (Tr. 1975; *compare* Tr. 1970). She walked with an antalgic gait. (Tr. 1977). Ms. Fearing was referred for physical therapy. (Tr. 1978).

Ms. Fearing also has back pain in all areas of her spine that she was in treatment for in parallel to her knee and hip pain. In August 2021, an MRI of her cervical spine showed tiny central disc protrusions at the C5-C6 level without stenosis. (Tr. 1503-04). By October, she had neck pain radiating into her right arm. (Tr. 885). Her primary care physician referred her to

6

Thomas Felter, M.D., for pain management. (*Id.*). On physical examination, she had full range of motion and full strength in her arms and legs but was tender to palpation to the paraspinal muscles. (Tr. 886). Dr. Felter recommended bilateral cervical facet medial branch nerve blocks as earlier conservative treatments had failed. (*Id.*).

Meanwhile, Ms. Fearing was also treating with neurologist Brendan Bauer, M.D., and his nurse practitioner for cervical and lumbar pain and associated numbness and tingling, and for migraines. (Tr. 1058, 1060-61). In October 2021, Dr. Bauer refilled her prescription for Nurtec, which Ms. Fearing reported significantly reduces her migraines.[4] (Tr. 1060-61). She returned to Dr. Bauer in November and reported daily headaches, 15 migraines a month, dizziness, memory loss, reduced arm strength, balance issues, and back pain. (Tr. 1053-54). Dr. Bauer noted increased muscle tone in her cervical and lumbar paraspinal muscles and decreased sensation in her right leg. (Tr. 1055). He ordered an EMG and prescribed Vyepti and Trudhesa for migraines and tizanidine for neck pain.[5] (Tr. 1056). The EMG was consistent with right C6 radiculopathy and right L5 radiculopathy. (Tr. 1079).

---

[4]    Nurtec is the brand name for Rimegepant, a medication used to prevent and treat migraine headaches. *Rimegepant, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a620031.html (last accessed Aug. 11, 2026).

[5]    Vyepti is the brand name for eptinexuman-jjmr, an injectable used to help prevent migraine headaches. *Eptinexumab-jjmr Injection, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a620022.html (last accessed Aug. 11, 2026).

Trudhesa is the brand name for dihydroergotamine, a nasal spray used to treat migraine headaches. *Dihydroergotamine Nasal Spray, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a622002.html (last accessed Aug. 11, 2026).

Tizanidine is a skeletal muscle relaxant used to relieve muscle spasms, cramping, and tightness caused by certain conditions including spinal injury. *Tizanidine, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a601121.html (last accessed Aug. 11, 2026).

Also in November, Ms. Fearing met with rheumatologist Matt Morrow, M.D., to treat her polyarthralgia and pain in the small joints of her hands, for which Celebrex had been ineffective.[6] (Tr. 1644). Dr. Morrow recommend Ms. Fearing stop Celebrex and start etodolac.[7] (Tr. 1645). When she returned to Dr. Morrow in December, Ms. Fearing reported her osteoarthritis improved with etodolac and her physical examination was normal. (Tr. 1629-30).

Ms. Fearing continued to have daily headaches and migraines in December 2021. (Tr. 1048). Dr. Bauer again noted increased muscle tone in the cervical and lumbar paraspinal muscles. (Tr. 1050; *see also* Tr. 1055). He recommended Ms. Fearing stop tizanidine and switch to Flexeril, prescribed Strattera for inattention, and provided greater trochanter bursa injections, bilateral brachial plexus injections, and trigger point injections into the upper cervical paraspinal muscles.[8] (Tr. 1051-52). In January 2022, Ms. Fearing reported to her pain management physician, Dr. Felter, that the branch blocks and trigger point injections provided 90% relief in cervical pain. (Tr. 879).

---

[6] Celebrex is the brand name for celecoxib, a non-steroidal anti-inflammatory drug (NSAID) used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis. *Celecoxib, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a699022.html (last accessed Aug. 11, 2026).

[7] Etodolac is an NSAID used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis. *Etodolac, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a692015.html (last accessed Aug. 11, 2026).

[8] Flexeril is the brand name for cyclobenzaprine, a skeletal muscle relaxant used to treat muscle spasms. *Cyclobenzaprine, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a682514.html (last accessed Aug. 11, 2026). Strattera is the brand name for atomoxetine, a drug used to increase the ability to pay attention and decrease impulsiveness and hyperactivity in people with ADHD. *Atomoxetine, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a603013.html (last accessed Aug. 11, 2026).

In March 2022, Dr. Bauer switched Ms. Fearing from Strattera to Vyvanse.[9] (Tr. 1046). She also received a greater trochanteric bursa injection and cervical trigger point injections. (*Id.*). Later that month, Ms. Fearing reported the trigger injections were helpful, but she still had neck and lower-back pain, numbness and weakness in her right arm and leg, and numbness in her hands. (Tr. 1038). A physical examination showed increased tone in the cervical and lumbar paraspinal muscles. (Tr. 1040). Dr. Bauer refilled Lyrica and Flexeril and ordered an EMG to investigate her right leg.[10] (Tr. 1041). The EMG was consistent with L5 radiculopathy. (Tr. 1068). Also in March, Ms. Fearing followed up with Dr. Morrow and reported intolerance to heat and cold, arm pain and numbness, back pain, joint pain, muscle pain, morning stiffness, joint stiffness, joint swelling, dizziness, sleep disturbances, and stress. (Tr. 1620). Dr. Morrow documented Heberden's and Bouchard's nodes on her fingers and knee crepitus, but her physical examination was otherwise normal. (Tr. 1621-22). Dr. Morrow recommended Tylenol and low-dose Tramadol for pain. (Tr. 1622).

In April 2022, Ms. Fearing described increasing cervical pain and worsening range of motion. (Tr. 876). Dr. Felter noted tenderness in the cervical paraspinal muscles and determined her symptoms were consistent with facet arthritis. (Tr. 877). He recommended a repeat branch block injected at a lower level in her spine than her previous injections. (*Id.*). That month, Dr. Bauer provided greater trochanteric bursa and trigger point injections. (Tr. 1036). Her primary

---

[9]     Vyvanse is the brand name for lisdexamfetamine, a drug used to control symptoms of ADHD. *Lisdexamfetamine, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a607047.html (last accessed Aug. 11, 2026).

[10]     Lyrica is the brand name for pregabalin, an anticonvulsant used to relieve neuropathic pain. *Pregabalin, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a605045.html (last accessed Aug. 11, 2026).

care physician prescribed Tramadol for back pain. (Tr. 1347). In May, an x-ray showed anterior osteophyte formation in the lumbar spine and degenerative changes in the sacroiliac joint. (Tr. 902-03). At the end of the month, Ms. Fearing reported constant pain and trouble walking. (Tr. 1031). Dr. Bauer noted some diminished strength in the right leg, increased tone in the paraspinal muscles, diminished reflexes, and a limping gait. (Tr. 1033). He performed another hip injection and prescribed methocarbamol for myalgias, refilled Lyrica, and discontinued Flexeril.[11] (Tr. 1033-34).

In June 2022, Dr. Felter reviewed Ms. Fearing's most recent lumbar MRI showing a bulging disc at the L3-L4 level with minimal foraminal narrowing and mild canal stenosis, facet hypertrophy contributing to mild bilateral neural foraminal narrowing at the L4-L5 level, and facet hypertrophy without stenosis at the L5-S1 level. (Tr. 873). He diagnosed cervical spondylosis without radiculopathy. (Tr. 874). At the end of the month, Dr. Felter provided bilateral cervical facet medial branch blocks at the C4, C5, and C6 vertebrae. (Tr. 900). Following the branch blocks, Ms. Fearing described nearly complete relief for a full day before the pain returned. (Tr. 870). Meanwhile, Ms. Fearing met with Dr. Morrow and reported Tylenol and Tramadol were not effective. (Tr. 1612). Dr. Morrow instructed Ms. Fearing to increase Tramadol. (Tr. 1614). In July, Dr. Felter performed radiofrequency denervation on the right side at the C4, C5, and C6 vertebrae. (Tr. 891-92). That same month, Dr. Bauer provided greater trochanter bursa and thoracic injections and refilled Vyvanse. (Tr. 1027, 1029).

---

[11] Methocarbamol is a muscle relaxant used to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. *Methocarbamol, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a682579.html (last accessed Aug. 11, 2026).

In September 2022, Dr. Felter provided cervical trigger point injections after finding "notable muscle tenderness" in the cervical paraspinal muscles. (Tr. 1693-94). In October, Ms. Fearing reported 80% relief in cervical pain after the radiofrequency denervation and trigger point injections and endorsed minimal pain. (Tr. 1689-90).

In December 2022, Ms. Fearing reported little benefit from the infusion treatments for her migraines. (Tr. 1297). On physical examination, Dr. Bauer noted Ms. Fearing was limping in pain and had mildly diminished strength and diminished reflexes in the right upper and lower extremities, decreased sensation in the right leg, and increased tone in the cervical and lumbar paraspinal muscles. (Tr. 1299). Dr. Bauer provided samples of Aimovig and occipital nerve blocks to treat her migraines and trigger point injections for cervical pain.[12] (Tr. 1300).

Ms. Fearing returned to Dr. Bauer in January 2023 with back pain. (Tr. 1782). She reported the occipital blocks helped her migraines. (*Id.*). Physical examination findings were similar to Dr. Bauer's findings in December. (Tr. 1784-85; *compare* Tr. 1299). He provided occipital nerve blocks and greater trochanter bursa injections then, and again in February. (Tr. 1785-86, 1780-81). Relief from hip pain lasted until April 2023. (Tr. 1772). At that time, Ms. Fearing also described worsening neck and shoulder pain. (*Id.*). Dr. Bauer administered bilateral brachial plexus injections. (Tr. 1775). At the end of April, Ms. Fearing reported the brachial plexus injections reduced her shoulder and neck pain, but it was returning. (Tr. 1771).

Ms. Fearing returned to her rheumatologist, Dr. Morrow, in May 2023 and reported her osteoarthritis was better overall but endorsed hip pain. (Tr. 1723-25). Dr. Bauer provided greater

---

[12]     Aimovig is the brand name for erenumab-aooe, an injection used to prevent migraine headaches. *Erenumab-aooe Injection, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a618029.html (last accessed Aug. 11, 2026).

trochanter bursa injections in May and again in July 2023. (Tr. 1763). In July 2023, Dr. Felter performed a repeat cervical facet medial branch radiofrequency denervation at the C4-C5 and C5-C6 levels. (Tr. 1792). Ms. Fearing continued to have neck pain and returned to Dr. Felter in August for a ketorolac injection.[13] (Tr. 1799). Dr. Felter reviewed thoracic and cervical x-rays showing, respectively, mild disc space narrowing and mild cervical lordosis. (Tr. 1800-01). In mid-August Ms. Fearing reported the hip injections decreased her pain by 50% for a few weeks, but her hip pain returned and her recent radiofrequency denervation procedure worsened her neck pain. (Tr. 1752). Dr. Bauer's nurse practitioner prescribed a compound cream for her pain. (Tr. 1757).

The results of another upper extremity EMG, dated November 16, 2023, showed mild chronic right C6 radiculopathy. (Tr. 1741).

In December 2023, Ms. Fearing met with Dr. Bauer's nurse practitioner to discuss Botox to treat cervical dystonia (*i.e.*, uncontrolled contraction of the neck muscles). (Tr. 1727). Ms. Fearing reported Aimovig helped her migraines some, but she was no longer tolerating the steroid injections and her severe neck pain was triggering migraines. (*Id.*). She described difficulty sleeping, driving, reading, and working at a desk. (Tr. 1733). A physical examination noted increased muscle tone, diminished range of motion, and muscle spasm on examination. (Tr. 1732). At the end of December, Ms. Fearing met with a new pain management provider who suggested she increase her dosage of gabapentin and recommended a cervical interlaminar epidural steroid injection at the C6-C7 level.[14] (Tr. 2054). She received that injection in January 2024. (Tr. 2091).

---

[13]     Ketorolac is an injectable NSAID used to relieve moderately severe pain in adults. *Ketorolac, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a614011.html (last accessed Aug. 11, 2026).

[14]     Gabapentin is an anticonvulsant used to relieve pain. *Gabapentin, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a694007.html (last accessed Aug. 11, 2026).

In March 2024, Ms. Fearing received her first Botox injection for cervical dystonia. (Tr. 2199). A physical examination noted a limited cervical range of motion and cervical muscle spasms. (Tr. 2204). Botox was injected into her bilateral trapezius, sternocleidomastoid, splenius capitis, semispinalis capitis, and longissimus muscles. (Tr. 2204). The nurse practitioner informed Ms. Fearing that relief from the injections can be expected to last three months. (Tr. 2205).

During her next follow-up appointment with Dr. Bauer in April 2024, Ms. Fearing reported constant pressure in her lower back causing pain with sitting, standing, and walking for prolonged periods, and more pain in her neck causing difficulty with neck mobility. (Tr. 2205). Her physical examination found reduced reflexes but was otherwise normal. (Tr. 2211-12). Dr. Bauer ordered spinal x-rays and requested insurance approval for a back brace. (Tr. 2212). The cervical spinal x-ray showed mild multilevel spondylosis. (Tr. 2213). Later that month, Ms. Fearing reported the Botox injections helped with neck pain for a few weeks but did not relieve her headaches. (Tr. 2214). She described neck pain, dizziness when looking up, and migraines with nausea. (*Id.*). Ms. Fearing finally received approval for Vyepti infusion treatments, so the nurse practitioner recommended that she begin the infusions and maintain her course of Botox treatment. (Tr. 2220; *see also* Tr. 1056 (prescribing Vyepti in 2021)). A lumbar spine MRI, dated June 2024, showed broad-based disc bulges at the L3-L4 and L4-L5 levels with facet degenerative changes; ligamentous hypertrophy, and a tiny disc bulge at the L5-S1 level with facet degenerative changes; and no significant narrowing at any level. (Tr. 2221).

B.         **Cardiac, Pulmonary, and Hematological Impairments**

In addition to musculoskeletal and neurological conditions, Ms. Fearing has hyperlipidemia for which she takes Repatha, prescribed by cardiologist Hassan Ibrahim, M.D.[15] (*See* Tr. 802). In January 2022, Ms. Fearing met with oncologist Brian R. Murphy, M.D., for evaluation of suspected lupus anticoagulant syndrome, in which the immune system mistakenly creates lupus anticoagulant antibodies that increase the risk of blood clots. (Tr. 842; *see Lupus Anticoagulant, Cleveland Clinic,* http://my.clevelandclinic.org/health/symptoms/lupus-anticoagulant (last accessed Aug. 11, 2026)). The next month, Ms. Fearing presented at the emergency department for right-arm and chest pain. (Tr. 726). An ultrasound showed a small deep vein thrombosis (blood clot) in her right arm. (*Id.*). She was discharged with a prescription for Xarelto.[16] (*Id.*). In April 2022, Dr. Ibrahim directed her to take Xarelto as prescribed for six months and then reduce the dose and take it indefinitely. (Tr. 793). That same month, Dr. Murphy confirmed Ms. Fearing has a hypercoagulable condition and repeated Dr. Ibrahim's directions to take Xarelto indefinitely. (Tr. 841). In December 2022, pulmonary function testing (PFT) was consistent with mild-to-moderate obstructive ventilatory impairment without reversibility and a severe diffusion abnormality, suggesting chronic obstructive pulmonary disease.

---

[15]       Repatha is the brand name for evolocumab, an injectable used to lower cholesterol and to lower the risk of stroke or heart attack. *Evolocumab Injection, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a615043.html (last accessed Aug. 11, 2026).
[16]       Xarelto is the brand name for rivaroxaban, used to prevent and treat deep vein thrombosis. *Rivaroxaban, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a611049.html (last accessed Aug. 11, 2026).

(Tr. 1494). In April 2023, Dr. Ibrahim prescribed Coumadin in lieu of Xarelto as Coumadin was believed to be more effective.[17] (Tr. 1995).

In September 2023, Ms. Fearing wore a 24-hour Holter monitor to investigate reported heart palpitations. (Tr. 1993). During those 24 hours, Ms. Fearing kept a symptoms journal documenting the times she experienced palpitations, dizziness, nausea, dyspnea, and chest pain. (*Id.*). She had isolated rare instances of premature atrial and ventricular contractions, but those occurrences did not correlate with the symptoms she recorded. (*Id.*). Dr. Ibrahim described the results as "unremarkable." (*Id.*).

### C.        Gastrointestinal Impairments

Ms. Fearing also has gastrointestinal issues including Crohn's disease and constipation-predominant inflammatory bowel disease that result in abdominal cramping, constipation, and diarrhea. (Tr. 1170, 1174-75). In February 2021, she met with her treating gastroenterologist Lawrence McCormack, M.D. (Tr. 1174). Dr. McCormack had previously switched her from Stelara, a biologic infusion medication, to budesonide, a corticosteroid medication. (Tr. 1174). Ms. Fearing explained that her symptoms flared since starting budesonide. (*Id.*). According to Ms. Fearing, her most taxing gastrointestinal symptoms are constipation followed by diarrhea severe enough to keep her in the bathroom for hours. (Tr. 1175). When her constipation is "really bad" she takes Linzess, which causes diarrhea.[18] (*Id.*). She explained she does not take Linzess when she

---

[17]        Coumadin is the brand name for warfarin, an anticoagulant used to prevent and treat blood clots. *Warfarin, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a682277.html (last accessed Aug. 11, 2026).

[18]        Linzess is the brand name for linaclotide, a medication used to treat irritable bowel syndrome with constipation by increasing the movement of food and waste through the stomach and intestines. *Linaclotide, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a613007.html (last accessed Aug. 11, 2026).

is working for that reason. (Tr. 1174). Dr. McCormack returned her to Stelara and recommended that she take a lower dose of Linzess. (Tr. 1175).

In June 2021, Ms. Fearing presented at the emergency department for left-sided abdominal pain and diarrhea with blood. (Tr. 1003). She was diagnosed with an exacerbation of her Crohn's and discharged with a prescription for prednisone.[19] (Tr. 1006). Ms. Fearing experienced another flare with rectal bleeding in October 2021 after she stopped taking Stelara due to a reaction with the Covid-19 vaccination. (Tr. 1162). Dr. McCormack prescribed Entyvio to replace Stelara.[20] (*Id.*). In January 2022, Ms. Fearing reported doing well on Entyvio with fewer daily bowel movements and no abdominal cramping. (Tr. 1157). But by April 2022, she experienced significant rectal bleeding several times a week. (Tr. 906). A sigmoidoscopy showed internal hemorrhoids, a possible source of the bleeding. (Tr. 835; *see also* Tr. 906). The hemorrhoids were removed in June 2022, resolving the rectal bleeds. (Tr. 825-26, 1151). In March 2023, Ms. Fearing reported constipation, upset stomach, feeling full early, vomiting, and that her Linzess caused diarrhea, even at the lowest dose. (Tr. 1867). Dr. McCormack switched her from Linzess to Trulance.[21] (*Id.*). In April 2023, an ultrasound to investigate right upper quadrant abdominal pain revealed hepatic steatosis (fatty liver disease). (Tr. 1668). Ms. Fearing experienced another flare of Crohn's the next month with

---

[19]     Prednisone is a corticosteroid used to treat certain types of arthritis and certain conditions affecting major organs, like the stomach and intestines. *Prednisone, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a601102.html (last accessed Aug. 11, 2026).

[20]     Entyvio is the brand name for vedolizumab, an injection used to treat Crohn's disease. *Vedolizumab Injection, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a614034.html (last accessed Aug. 11, 2026).

[21]     Trulance is the brand name for plecanatide, a medication used to treat irritable bowel syndrome with constipation by increasing the movement of food and waste through the stomach and intestines. *Plecanatide, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a617020.html (last accessed Aug. 11, 2026).

16

diarrhea and lower abdominal pain. (Tr. 1864). She did not want further infusion treatment so Dr. McCormack prescribed Skyrizi, an oral medication used to treat Crohn's disease. (*Id.*). Issues with insurance approval prevented Ms. Fearing from starting Skyrizi, so Dr. McCormack prescribed Rinvoq, a similar oral medication. (Tr. 1861). By December 2023, despite Rinvoq, Ms. Fearing was having more frequent bowel movements, up to seven times a day, with blood and abdominal pain. (Tr. 1855). Dr. McCormack prescribed colestipol to slow the diarrhea. (*Id.*). In a February 2024 follow-up visit with her oncologist, Dr. Murphy, Ms. Fearing endorsed intermittent abdominal cramps from Crohn's, but denied bleeding, leg pain, swelling, and shortness of breath. (Tr. 2141). In May 2024, Ms. Fearing met with a colorectal surgeon for evaluation of hemorrhoids and reported diarrhea, rectal bleeding, pain, itching, and discomfort. (Tr. 2266). The surgeon treated her hemorrhoids and referred her for pelvic floor therapy. (Tr. 2269).

In July 2024, Ms. Fearing returned to her primary care physician's office for an employment physical, reporting that she was in "overall good health" and wanted to start working full-time. (Tr. 2297-98). She reported shortness of breath worse with humidity, no chest pains, and regular bowel movements. (Tr. 2298). She reported she was misdiagnosed with Crohn's disease and has since been diagnosed with nonalcoholic cirrhosis of the liver. (*Id.*). As documented above, Ms. Fearing disliked the medication intended to relieve constipation because it caused diarrhea, even at the lowest dose. She stopped taking those medications sometime before July. (*Id.*). After stopping the gastrointestinal-related medications, she had "intermittent good days and bad days, albeit less severe than before." (*Id.*).

17

### D.        Mental Health Impairments

Ms. Fearing also claims disability from mental health conditions, including anxiety and bipolar disorder. Her primary care physician regularly prescribed Xanax for anxiety. (*See, e.g.*, Tr. 1330, 1353, 1360, 1378). In August 2021, she was assessed with anxiety and bipolar disorder and prescribed Latuda.[22] (Tr. 1371). Ms. Fearing declined counseling and did not seek mental health treatment again until March 2023. (*Id.*).

In March 2023, Ms. Fearing met with psychiatrist Kelly Sprout, M.D., and reported mood swings, irritability, paranoia that others are talking about her, nightmares, flashbacks of abuse, poor memory, and poor sleep. (Tr. 2045, 2047). She also reported migraines and joint and back pain. (Tr. 2046). Dr. Sprout noted Ms. Fearing was depressed with a constricted affect but had no memory impairment, displayed normal attention, was cooperative, and had good insight and judgment. (Tr. 2047). Dr. Sprout prescribed Caplyta for mood stabilization.[23] (Tr. 2048). Ms. Fearing tolerated the medication well and reported that it kept her "mellow." (Tr. 2040).

In July 2023, Ms. Fearing's son reported that she has episodes where she gets angry, yells, and throws or hits things. (Tr. 2035). Ms. Fearing reported depression, agitation, and feeling stressed about her job. (*Id.*). She described constant anxiety, intermittent paranoia, poor sleep, and poor appetite. (*Id.*). Dr. Sprout increased Caplyta for further mood stabilization. (Tr. 2039). The next month, Ms. Fearing reported a good mood and feeling calmer and less depressed, with

---

[22]        Latuda is the brand name for lurasidone, an atypical antipsychotic used to treat bipolar disorder. *Lurasidone, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a611016.html (last accessed Aug. 11, 2026).

[23]        Caplyta is the brand name for lumateperone, an atypical antipsychotic used to treat bipolar disorder. *Lumateperone, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a620014.html (last accessed Aug. 11, 2026).

18

intermittent anxiety. (Tr. 2029). She again expressed some paranoia, stress from her job, and poor sleep, but declined an increased dose of Caplyta. (Tr. 2029, 2033).

In September 2023, Ms. Fearing reported paranoia, irritability, mood swings, poor sleep, and low energy. (Tr. 2023). Dr. Sprout increased Caplyta to address bipolar symptoms and paranoia. (Tr. 2027). Dr. Sprout added lithium for mood stabilization in October to address Ms. Fearing's continued stress, low energy, and "agitat[ion] over stupid things."[24] (Tr. 2022, 2017). The next month, Ms. Fearing reported sleeping excessively after taking lithium and stopped after two days. (Tr. 2011). Dr. Sprout prescribed Depakote.[25] (Tr. 2015).

At the next follow-up visit in January 2024, Ms. Fearing was disheveled and avoided eye contact, was depressed and anxious with a constricted affect, had impaired short-term memory, was tearful, and expressed feeling paranoid that other people are talking about or plotting against her. (Tr. 2005, 2007-08). She described mental anguish about working because she has a hard time dealing with people and, by the middle of her shift, the pain starts and "everything hurts." (*Id.*, Tr. 2007). Dr. Sprout prescribed mirtazapine to address Ms. Fearing's depressive symptoms. (Tr. 2009). Ms. Fearing stopped taking mirtazapine after three weeks because it increased her anxiety. (Tr. 1999). In February, she described stress from working, depression, and mood swings. (*Id.*). Mental status examination revealed constricted affect and a depressed mood but was otherwise

---

[24]     Lithium-based medications are used to treat and prevent manic episodes in people with bipolar disorder. *Lithium, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a681039.html (last accessed Aug. 11, 2026).

[25]     Depakote is the brand name for valproic acid, an anticonvulsant used to treat mania in people with bipolar disorder as well as seizures and to prevent migraines. *Valproic Acid, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a682412.html (last accessed Aug. 11, 2026).

normal. (Tr. 2001-02). Dr. Sprout prescribed Trintellix for depression and increased the dose the following month. (Tr. 2003, 2243).

### III.    Medical Opinions

On initial review, state agency medical consultant Mehr Siddiqui, M.D., and state agency psychological consultant David Dietz, Ph.D., reviewed treatment records, the consultative examiner's opinion, and the RFC findings from the February 2021 disability decision. (Tr. 181-84, 186). In the prior decision, the ALJ determined Ms. Fearing had the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: postural limitation of no climbing of ladders, ropes, or scaffolds. Occasional climbing of ramps and stairs. Frequent balancing. Occasional stooping, kneeling, crouching and crawling. Occasional use of the bilateral lower extremities for operation of foot controls. Manipulative limitation of frequent use of the bilateral upper extremities for reaching, and handling. Environmental limitation to avoid all exposure to hazards, such as dangerous moving machinery, commercial driving, and unprotected heights. Work limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions, with few if any work place changes. No interaction with the general public. Occasional interaction with coworkers and supervisors.

(Tr. 181).

Dr. Siddiqui did not adopt the former RFC's physical restrictions because "there is new and material evidence (or there are changed circumstances) affecting the findings" including "a new [diagnosis] of lupus." (Tr. 188). Dr. Siddiqui opined Ms. Fearing can lift and carry 20 pounds occasionally, 10 pounds frequently; stand and/or walk and sit for about 6 hours each in an 8-hour workday; frequently climb ramps and stairs but never ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; frequently reach overhead with both arms; and must avoid all exposure to unprotected heights and dangerous machinery. (Tr. 187-88). Dr.

20

Siddiqui explained that Ms. Fearing's degenerative spinal conditions, lupus, and history of deep vein thrombosis supported the lifting, carrying, standing/walking, and sitting limitations, but he did not explain the basis for the other limitations. (*Id.*). Dr. Dietz adopted the former RFC's mental restrictions "in accordance with [Acquiescence Ruling] 98-4." (Tr. 188).

Jinhui Wang, Psy.D., evaluated Ms. Fearing as part of her disability application. (Tr. 1679-1702). Dr. Wang assessed her mental functional capacities in "understanding, remembering, and carrying out instructions," "maintaining attention and concentration [and] maintaining persistence and pace" to perform simple and multi-step tasks, "responding appropriately to supervision and to coworkers in a work setting," and "responding appropriately to work pressures in a work setting." (Tr. 1702). Documenting Ms. Fearing's work history, Dr. Wang noted she worked as a subassembly worker between 2013 and 2017 and was laid off in the absence of business. (Tr. 1699). She then worked as a nurse's aide for eight months before returning to a subassembly position in 2018. (*Id.*). She stopped working in 2022 because she felt mentally overwhelmed and had a lot of physical issues, including Crohn's disease. (*Id.*). In 2023, Ms. Fearing held an STNA position for two months but stopped because she felt overwhelmed mentally and physically, citing her work-related hip injury. (*Id.*). Her work was satisfactory, but she had anxiety, felt overwhelmed being around people, and was paranoid that others were talking about her. (*Id.*). Dr. Wang noted Ms. Fearing has dealt with work pressure in the past by having meltdowns, removing herself from the situation, smoking cigarettes, crying, and screaming. (*Id.*). When asked why she no longer works, Ms. Fearing said work was too much with her mental and physical health issues. (*Id.*). Dr. Wang noted Ms. Fearing was cooperative, intelligible, and appeared sad at times; she tracked the

21

flow of conversation, remained on task and worked at an adequate pace while answering her questions and completing short mental exercises. (Tr. 1700-01).

Ms. Fearing endorsed several mental health impairments, including bipolar, ADHD, PTSD, and anxiety, but Dr. Wang had no access to medical records to verify those diagnoses and concluded the findings of her limited evaluation called for only a diagnosis of unspecified depressive disorder. (Tr. 1701). Based on her intellectual functioning and in the absence of issues with understanding or remembering during the evaluation, Dr. Wang determined Ms. Fearing could understand, remember, and carry out instructions in a work setting. (Tr. 1702). In attention, concentration, persistence, and pace in performing work-related tasks, Dr. Wang did not observe impairment during the evaluation but noted that if Ms. Fearing's depressive symptoms worsened, it could diminish her abilities to focus and concentrate. (*Id.*). In responding appropriately to supervision and coworkers, Dr. Wang determined Ms. Fearing "maintained certain capacity" because she "was cooperative and displayed average social skills during the evaluation" and reported getting along with others "for the most part." (*Id.*). Last, in responding appropriately to workplace pressures, Dr. Wang concluded Ms. Fearing's depressive symptoms "could lower her frustration tolerance and put her at risk for workplace pressure." (*Id.*).

On reconsideration, state agency medical consultant Abraham Mikalov, M.D., and state agency psychological consultant Audrey Todd, Ph.D., reviewed updated records and adopted Dr. Siddiqui's and Dr. Dietz's findings at the initial level as "consistent with and supported by the totality of the evidence in file, including any updated evidence received at the reconsideration level." (*Compare* Tr. 187-88 *with* Tr. 199-200; *compare* Tr. 181 *with* Tr. 201).

In December 2023, Dr. Bauer, Ms. Fearing's neurologist treating her back pain and migraines, completed a Physical Medical Source Statement about Ms. Fearing's physical impairments and their effect on her ability to perform work-related tasks. (Tr. 1713-16). Dr. Bauer explained that Ms. Fearing has cervical dystonia, lumbar radiculopathy, chronic migraines, cervical paraspinal muscle spasms, brachial plexus neuropathy, and cervical radiculopathy and those conditions cause muscles spasms, neck and lower-back pain, dizziness, fatigue, visual disturbances, pain, and weakness. (Tr. 1713). Those symptoms have persisted despite multiple medications, physical therapy, massage, use of a TENS unit, and Botox injections. (*Id.*). He determined Ms. Fearing's impairments are likely to produce good days and bad days and limited her to sitting and standing for one minute at a time and for less than two hours total in a workday and never lifting more than 10 pounds. (Tr. 1714, 1716). She can reach in front of her body and perform tasks involving fine and gross manipulation between 5% and 15% of the workday but can never reach overhead. (Tr. 1715). And she should avoid exposure to temperature changes, loud noises, fumes, and gases because they trigger migraines. (Tr. 1716). Dr. Bauer concluded Ms. Fearing will need more breaks due to weakness, fatigue, and pain; she will be off task more than 25% of the workday; and she cannot perform even low-stress work. (Tr. 1714-15).

In January 2024, Dr. Sprout, Ms. Fearing's treating psychiatrist, completed a Mental Impairment Questionnaire about Ms. Fearing's mental impairments and their effect on her "ability to do *work-related tasks on a day-to-day basis in a regular work setting.*" (Tr. 1717) (emphasis in original). Dr. Sprout diagnosed bipolar disorder, current episode depressed with psychotic features, and generalized anxiety disorder. (Tr. 1717). Dr. Sprout opined Ms. Fearing is "seriously limited but not precluded" from (1) carrying out short and simple instructions, (2) performing activities within

a schedule, (3) maintaining an ordinary routine without special supervision, (4) understanding and remembering very short and simple instructions, and (5) maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness. (Tr. 1717-18). In all other abilities considered in the four areas of mental functioning, Dr. Sprout opined Ms. Fearing was either "unable to meet competitive standards" or had "no useful ability to function." (*Id.*). Last, Dr. Sprout opined Ms. Fearing would be absent from work three-to-five days a week and off task for 50% of the workday when present. (Tr. 1718). In support of those opinions, Dr. Sprout listed clinical findings including Ms. Fearing's disheveled appearance, avoidant eye contact, constricted and tearful affect, depressed and anxious mood, and paranoid ideations. (Tr. 1717).

**IV.     Function Reports and Administrative Hearing**

In August 2022, Ms. Fearing completed an Adult Function Report about how her conditions affect her functioning. (Tr. 654-61). She noted it took her three days to complete the form due to issues with her right hand. (Tr. 654). Ms. Fearing endorsed weakness in her right arm and hand; pain and electric-like shocks in her legs, hips, and right arm; back pain and constant neck pain; severe symptoms from Crohn's disease; migraines; insomnia; severe anxiety; PTSD; bipolar depression; and ADHD. (*Id.*). These conditions and symptoms cause her to drop things and trip; affect her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, understand and follow instructions, use her hands, and get along with others. (Tr. 654, 659). She can lift 30 pounds, walk about one-and-a-half blocks, and pay attention for up to ten or fifteen minutes. (Tr. 659). She struggles to follow detailed instructions, does not handle stress well, and takes time to adapt to changes in routine. (Tr. 659-

24

60). When her Crohn's symptoms flare, she is in the bathroom two to three times a day for one to two hours at a time. (Tr. 661). Her symptoms are always present but sometimes more severe. (*Id.*).

Ms. Fearing testified in the July 2024 administrative hearing about how her conditions affect her ability to function. She has COPD, emphysema, degenerative joint disease, Crohn's disease, cervical dystonia, and bulging discs. (Tr. 49, 53, 55-56). These conditions cause pain in her joints, neck, and lower back, numbness and tingling in her right arm, and disturbed sensations in her hands. (Tr. 57). She has problems navigating stairs due to COPD, emphysema, and degenerative joint disease. (Tr. 49). She has pain when bending, looking upward, or reaching overhead. (Tr. 51). Her neck "locks up," she drops things from her hands without realizing it, constantly switches positions, and takes rest breaks during housework. (Tr. 57-58). She feels her best in the morning and worse as the day goes on. (Tr. 58). She estimates she can walk and stand for about an hour at a time, sit for about an hour to an hour-and-a-half before her lower back and neck hurt, and lift a six-pack of pop or a gallon of milk. (*Id.*). Ms. Fearing also has bipolar disorder and anxiety, conditions that interfere with her tolerance for being around others. (Tr. 56). Going to the grocery store "is like torment" for Ms. Fearing "because there's just so many people." (*Id.*). She felt overwhelmed and anxious at her daughter's wedding, with just 20 other people attending. (Tr. 56-57).

Ms. Fearing last worked in a resort's laundry facility in April and May 2024. (Tr. 51-52). She stopped after three weeks because the job required bending and caused breathing issues. (Tr. 52). She could not work in a seated position sorting bolts, for example, because the repetitive motion affects her joints. (Tr. 61). She would have trouble staying at a workstation because of her anxiety with being around others, the repetitive motions, and her frequent need to use the

restroom. (*Id.*). When her Crohn's symptoms flare, she uses the bathroom eight or more times a day, typically for 45 minutes each. (Tr. 62). She has been fired from positions for being in the bathroom too often. (Tr. 63).

The VE then testified, classifying Ms. Fearing's past relevant work as a general inspector, a semi-skilled position. (Tr. 64). To the VE, the ALJ questioned whether an individual of Ms. Fearing's age, education, and experience could perform her past relevant work if limited to the set of restrictions ultimately adopted into the ALJ's RFC. (Tr. 64-65; *see also* Tr. 24). The VE opined such a person could not work as a general inspector but could work as a collator operator, routing clerk, and marking clerk. (Tr. 65-66). The VE also testified an employee can be absent no more than once a month and can be off-task no more than 10% of the workday and an employer would not provide for extra breaks beyond that off-task tolerance. (Tr. 67-68).

## STANDARD FOR DISABILITY

Eligibility for benefits turns on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine whether a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Fearing had not engaged in substantial gainful activity since March 14, 2022, the date she claimed her disability began. (Tr. 19). At Step Two, the ALJ identified the following severe impairments:

> Degenerative disc disease of the cervical and lumbar spine, with bilateral radiculopathy and pain; moderate depression; bipolar disorder; generalized anxiety disorder; greater trochanter bursitis of the hip; upper right extremity cubital syndrome of the left wrist with tenosynovitis, status post wrist surgeries; post-traumatic stress disorder (PTSD); right should rotator cuff tear; borderline intellectual functioning; chronic insomnia; osteoarthritis of multiple joints; non-alcoholic cirrhosis of the liver; emphysema; migraine headaches; lupus anticoagulant positive; and Crohn's disease.

(Tr. 20). At Step Three, the ALJ found Ms. Fearing's impairments did not meet or medically equal the requirements of a listed impairment. (*Id.*).

At Step Four, the ALJ determined Ms. Fearing's RFC as follows:

27

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can perform no climbing of ladders, ropes, or scaffolds; only occasional climbing of ramps and stairs; frequent balancing; and occasional stooping, kneeling, crouching and crawling. She can occasionally use the bilateral lower extremities for operation of foot control and can frequently use the bilateral upper extremities for reaching and handling; and she should avoid all exposure to hazards, such as dangerous moving machinery, commercial driving, and unprotected heights. Additionally, the claimant is limited to simple, routine, and repetitive tasks in a work environment free from fast-paced production requirements, such as moving assembly lines and conveyor belts, involving only work-related decisions, with few, if any work-place changes; no interaction with the general public; and occasional interaction with coworkers, and supervisors.

(Tr. 24). The ALJ concluded Ms. Fearing cannot perform past relevant work. (Tr. 34). At Step Five, the ALJ determined Ms. Fearing could perform work in the national economy, including as a collator operator, routing clerk, and marking clerk. (Tr. 36). Thus, the ALJ concluded Ms. Fearing was not disabled. (*Id.*).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole.

28

Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000,

2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

**DISCUSSION**

Ms. Fearing raises three issues for review. First, she contends the ALJ applied the wrong standard of review in determining the February 2021 RFC was supported by the current record. (ECF #16 at PageID 2361). Next, she argues the ALJ did not properly evaluate Drs. Bauer and Sprout's medical opinions. (*Id.* at PageID 2368, 2370). Last, she asserts the ALJ "failed to articulate a supportable rationale" for concluding the statements she made about the intensity, persistence, and effect of her symptoms were not consistent with the record. (*Id.* at PageID 2373). I address each argument in turn.

## I.      Review of subsequent disability claim involving an unadjudicated period

Ms. Fearing's first alleged error concerns the standard under which the ALJ considered her subsequent disability claim. In 2021, a prior ALJ determined Ms. Fearing was not disabled between September 15, 2018 and February 24, 2021 (the date of that ALJ's decision), and issued an RFC for light work with added restrictions. (*See* Tr. 163). In Apil 2022, Ms. Fearing again applied for DIB alleging disability for a previously unadjudicated period beginning March 14, 2022. (Tr. 317). A new ALJ considered her claim and adopted the prior ALJ's RFC. (Tr. 34). Ms. Fearing contends adopting the prior RFC is an incorrect application of *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018), and therefore not supported by substantial evidence. (ECF #16 at PageID 2362).

The Social Security Administration's general policy is to treat a later claim involving an unadjudicated period as "a new issue that requires an independent evaluation." *See* Social Security

30

Acquiescence Ruling (AR) 24-1(6), 89 Fed.Reg. 92992-02, at 92994 (Nov. 25, 2024). Thus, the ALJ does not consider findings made in the prior ALJ's decision as evidence in adjudicating disability with respect to the unadjudicated period in the later claim but instead considers the facts and issues de novo. *Id.* But the Sixth Circuit has diverged from this policy. In *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997), the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Id.* Thus, absent evidence that a claimant's condition had changed, the findings from an earlier decision were binding on the ALJ in a subsequent proceeding. *Id.* Later, in *Earley*, the Sixth Circuit clarified that when a claimant alleges disability for a subsequent unadjudicated period, the ALJ must give the new application a "fresh look" when it "contain[s] new evidence or satisf[ies] a new regulatory threshold . . . while being mindful of past rulings and the record in prior proceedings." 893 F.3d at 931. But "[f]resh review is not blind review. A later [ALJ] may consider what an earlier [ALJ] did if for no other reason than to strive for consistent decision making." *Id.* at 934. The court explained "it is fair for an [ALJ] to take the view that, absent new and additional evidence, the [prior ALJ's] findings are a legitimate, albeit *not binding*, consideration in reviewing a second application." *Id.* at 933 (emphasis added).

Since then, the Sixth Circuit has discussed the application of *Earley* in several unpublished decisions. In *Dennis D. v. Comm'r of Soc. Sec.*, No. 23-3667, 2024 WL 1193662 (6th Cir. Mar. 20, 2024), the Sixth Circuit held that an ALJ's misstatement that the prior ALJ's RFC was "binding" did not warrant remand where the record was "replete with evidence" that the ALJ "reached an independent conclusion while recognizing that he was not bound by the prior decision—as

31

required under *Earley.*" *Id.* at \*4-5. The *Dennis D.* court explained that even if the ALJ misstated the legal standard, the question for the court's consideration is not whether the ALJ identified the correct standard, but whether the ALJ "treated his review of the new application as if he were bound by the prior decision, thereby depriving [the claimant] of a 'fresh look'" under *Earley. Id.* at \*4.

Later, in *Gooden v. Comm'r of Soc. Sec.,* No 23-3927, 2024 WL 2830817 (6th Cir. June 4, 2024), the Sixth Circuit re-emphasized that "the key question is whether the second ALJ treated the new application 'as if' they were 'bound by the prior decision.'" *Id.* at \*4 (quoting *Dennis D.,* 2024 WL 1193662, at \*4). If not, then the ALJ does not reversibly err. *Id.* The mere fact the ALJ arrives at the same or similar RFC as the prior ALJ is not "ipso facto proof that [the ALJ] considered herself bound by the prior decision, even where a new severe impairment is found." *Conrad v. Comm'r of Soc. Sec.,* No. 1:25-cv-601, 2025 WL 3211018, at \*17 (N.D. Ohio Nov. 18, 2025), *report and recommendation adopted,* 2026 WL 696715 (N.D. Ohio Mar. 12, 2026); *see also Dennis D.,* 2024 WL 1193662, at \*5 (finding the similarity of the conclusions reached by the ALJ and the prior ALJ has no bearing on whether the ALJ applied the correct standard).

The question before me is whether the ALJ treated Ms. Fearing's new application as if she were bound by the prior decision. Nothing in the record suggests that is the case. On the first page of her written decision, the ALJ stated she would consider whether to adopt the prior RFC "per AR 98-4(6)," referring to *Drummond*, but not to *Earley.*[26] (Tr. 17). The ALJ then reviewed medical records from after the prior decision, Ms. Fearing's current statements about the present intensity,

---

[26]    The ALJ could not have referred to AR 24-1(6) as that ruling was issued three months after the ALJ's decision.

32

persistence, and effect of her symptoms, and the medical opinions and the prior administrative

medical findings—also from after the prior decision. (Tr. 25-30). The ALJ determined the following

evidence from after the previous decision in February 2021 supported the physical RFC:

- Reports of Ms. Fearing's employment as an STNA working 12-hour days in October 2023 and full-time in February 2024;

- Good control of her gastrointestinal symptoms,

- Treatment notes showing no labored breathing or significant breathing problems on examination in June 2022 and October 2022, December 2023, and April 2024;

- Treatment notes showing Ms. Fearing had some pain with range of motion testing and intermittent findings of reduced strength in April and October 2022 and January, February, and April 2024;

- The absence of significant degenerative changes in the bilateral wrists and hands in a December 2021 x-ray;

- Mild-to-moderate findings from November 2021 EMG testing;

- Mild findings on the lumbar and cervical MRIs from May and September 2022; and

- Her statements in 2024 about the effectiveness of her migraine medications.

(Tr. 30-31).

In assessing limitations addressing her mental health impairments, the ALJ looked to the

state agency psychological consultants' findings. After the consultants reviewed the current medical

records, they determined the evidence supported the same limitations set forth in the prior ALJ's

decision and adopted the prior RFC's restrictions to simple, routine, and repetitive tasks without

fast-paced production requirements, making work-related decisions, few workplace changes, no

interaction with the public, and occasional interaction with coworkers and supervisors. (Tr. 188,

201). The ALJ found those limitations persuasive because the evidence, including the current

mental health treatment notes and the consultative examiner's opinion, showed no more than moderate limitations. (Tr. 32). Thus, the ALJ gave the claim the "fresh review" *Earley* contemplated: she independently reviewed the current medical evidence while being mindful of the prior ALJ's ruling and crafted an RFC that, though identical to the prior RFC, accommodated the limitations the ALJ determined were consistent with and supported by the current record. *See Dennis D.*, 2024 WL 1193662, at *6 (upholding the Commissioner's decision where the ALJ considered a prior ALJ's RFC alongside the claimant's proffered evidence pertinent to the unadjudicated period to formulate the RFC). Only after this discussion did the ALJ state the prior ALJ's RFC determination is supported by the current record. (Tr. 34).

Ms. Fearing argues her case is analogous to *Dilauro v. Comm'r of Soc. Sec.*, No. 5:19-cv-2691, 2021 WL 1175415 (N.D. Ohio Mar. 29, 2021). (*See* ECF #16 at PageID 2367). But *Dilauro* is inapplicable. There, the ALJ did not cite *Earley*, but also stated that "[a]bsent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ," and then adopted the claimant's first RFC on the grounds that "no new and material evidence exist[ed]." *Dilauro*, 2021 WL 1175415, at *3. The court reversed the ALJ's decision, finding that these errors "permeated the entire adjudication." *Id.* Here, the ALJ did not find she was bound by the 2021 decision. Then, in formulating the RFC, the ALJ thoroughly reviewed and weighed the current medical records, statements, and medical opinions. Although the limitations of the new RFC align with the prior ALJ's RFC, the ALJ crafted the RFC based on an independent assessment of a new record, without holding the prior RFC as presumptively binding on the current claim.

My review convinces me the ALJ properly applied *Earley* and assessed limitations that are supported by the current medical record. Therefore, I decline to order remand on Ms. Fearing's first issue.

## II.      Medical Opinion Evaluation

Ms. Fearing next contends the ALJ did not properly evaluate Dr. Bauer's or Dr. Sprout's medical opinions. (ECF #16 at PageID 2368, 2372).

In assessing the claimant's RFC, the ALJ must review all medical opinions and prior administrative findings and explain how persuasive she finds them. *See* 20 C.F.R. § 404.1520c(b); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). The ALJ considers five factors to determine persuasiveness: (1) supportability; (2) consistency; (3) the source's relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) the source's specialization; and (5) any other factors that tend to support or contradict a medical opinion. 20 C.F.R § 404.1520c(c)(1)-(5). The regulations require the ALJ to "explain how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinion," the two most important factors. *See id.* § 404.1520c(b)(2). The ALJ's explanation should "generally include[ ] an assessment of the supporting objective medical evidence and other medical evidence," (supportability) and "how consistent the medical opinion or prior administrative medical finding is with other evidence in the claim" (consistency). *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 5859, 2017 WL 168819 (Jan. 18, 2017). The reasons for the ALJ's conclusions must be stated in a manner that allows the reviewing court to "trace the path of the ALJ's reasoning" from evidence to conclusion. *Stacey v. Comm'r of Soc. Sec.*, 451 F.App'x 517,

35

519 (6th Cir. 2011). If the ALJ discusses both consistency and supportability, and substantial evidence supports the discussion, then the court may not disturb the ALJ's findings. *Paradinovich v. Comm'r of Soc. Sec.*, No. 1:20-cv-1888, 2021 WL 5994043, at *7 (N.D. Ohio Sept. 28, 2021), *report and recommendation adopted*, 2021 WL 5119354 (N.D. Ohio Nov. 4, 2021).

> The ALJ assessed Dr. Bauer's medical opinion as follows:
>
> Brendan Bauer, MD, the claimant's treating medical care provider, opined on December 12, 2023, that the claimant could sit for 1 hours at a time, stand for one hour at a time, and sit and stand/walk for less than 2 hours total in an 8-hour day. She could rarely lift and carry less than 10 pounds and she could use her right had 10-15 percent of the time, her right and left fingers 10 percent of the time, and her left and right arms 5 percent of the time; but she could use her left hand 15 percent of the time. Additionally, she would be off-task 25 percent of the day and she was incapable of even "low stress" work. Dr Bauer also opined that the claimant had good days and bad days, but would not miss work due to her impairment or treatment. Dr Bauer based his opinion on the claimant's symptoms of neck pain, lower back pain, chronic migraine headaches, dizziness, fatigue, visual disturbance, pain in legs, and weakness with clinical findings and objective signs of muscle spasms, neck pain, lower back pain, painful turning/pulling of her neck, lumbar radiculopathy due to degenerative disc disease, chronic migraine headaches.
>
> The undersigned does not find this opinion persuasive, as it is not consistent with the prior Administrative Law Judge decision of February 2021, the treatment notes showing many normal physical examination findings, and the opinion of the state agency medical consultants. The claimant had many physical examinations with normal or only mild findings; and few findings to support rare use of the upper extremities. Additionally, Dr. Bauer did not cite findings of the upper extremities beyond neck pain and neck spasms to support his limitations regarding the upper extremities.

(Tr. 33).

The ALJ's discussion properly addresses both the supportability of Dr. Bauer's opinion and the consistency of his opinion with other evidence in the record. Earlier in the decision, the ALJ discussed Dr. Bauer's treatment records and records from other providers evaluating similar complaints. (*See* Tr. 25-30). Dr. Bauer's treatment notes reflect intermittently normal or mildly

abnormal physical examinations, including increased muscle tone, mildly diminished reflexes and strength, and a typically normal but sometimes limping gait. (*See, e.g.*, Tr. 1045, 1050, 1055, 1774, 2211). And other physical examination findings documented by other providers show similarly normal or mildly abnormal findings, including full strength and range of motion with tenderness to the paraspinal muscles. (*See, e.g.*, Tr. 874, 877, 886, 2053). The ALJ's discussion properly reflects her consideration of the supportability and consistency of Dr. Bauer's opinion and substantial evidence supports her conclusion.

Ms. Fearing takes issue with the ALJ's comparison of Dr. Bauer's opinion to the prior ALJ's RFC and the state agency medical consultants' opinions adopting that prior RFC. (ECF #16 at PageID 2370). She argues "although [the ALJ] relied on the state agency opinions as rationale for discounting the opinion of Dr. Bauer, she only found that these opinions were partially supportive to the extent that they were supported by the prior ALJ determination," and therefore the ALJ did not address the consistency and supportability of the opinion with respect to the current medical evidence. (*Id.*). But, as stated above, the ALJ properly reviewed the supportability and consistency of the opinion with respect to the *current* medical evidence: the physical examinations showing normal or mild findings. Thus, whether the ALJ erred in comparing Dr. Bauer's opinion to other opinion evidence is immaterial as the ALJ's reasoning can be sustained on other grounds.

Next, Ms. Fearing contends the ALJ did not properly evaluate Dr. Sprout's medical opinion. (ECF #16 at PageID 2372). The ALJ addressed Dr. Sprout's opinion as follows:

> On January 10, 2024, Kelly Sprout, MD, opined that the claimant was seriously limited in her ability to carry out very short and simple instructions, perform activities within a schedule, and sustain an ordinary routine without special supervision. Additionally, she was seriously limited in her ability to understand and

remember very short and simple instructions and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Dr Sprout also opined that the claimant was unable to meet competitive standards for carrying out detailed instructions, maintain attention and concentration for extended periods, manage regular attendance and be punctual withing customary tolerance, work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods, remember locations and work- like procedures, interact appropriately with the general public, and ask simple questions or request assistance. She had no useful ability to understand and remember detailed instructions, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, and set realistic goals or make plans independently of others. Dr Sprout further opined that the claimant would be absent from work 3-5 days per week, she would be off-task 50 percent of the day.

Dr Sprout based her opinion on findings of disheveled appearance, avoidant eye contact, constricted and tearful affect, depressed and anxious mood. The undersigned does not find this opinion persuasive, as it is not consistent with the prior Administrative Law Judge decision of February 2021, the treatment notes showing many normal mental examination findings with little treatment until 2023, and the opinion of the state agency psychological consultants.

Dr Sprout noted that she had been treating the claimant for bipolar disorder, and generalized anxiety disorder since March 2023, which is a significant treatment history, but there are few abnormal examination findings in the record prior to March 2023.

(Tr. 33-34).

Though brief, the ALJ properly considered the supportability and consistency of the opinion. In terms of supportability, the ALJ focused on Dr. Sprout's mental status examination findings. The ALJ noted that Ms. Fearing began treatment with Dr. Sprout in March 2023, about a year after her alleged disability date. (Tr. 30). She acknowledged Ms. Fearing's symptoms waxed and waned, and she sometimes endorsed paranoid thoughts that other people are talking about her. (*Id.*). But Ms. Fearing generally described mild-to-moderate symptoms and Dr. Sprout typically noted normal findings, including intact memory, normal attention, good insight and judgment,

and intact social and emotional reciprocity. (*See, e.g.*, Tr. 2001-02, 2019-20, 2037-38, 2025-26, 2239-40, 2042, 2047). Objective medical evidence, including relatively normal mental status examinations, is an acceptable factor to consider in evaluating opinion evidence of mental limitations. *See, e.g., Tucker v. Comm'r of Soc. Sec.*, 775 F.App'x 220, 224 (6th Cir. 2019) (finding the ALJ did not err by relying in part on "largely normal" mental status examinations). Those largely normal findings indeed appear to undermine rather than support Dr. Sprout's opinion that Ms. Fearing is seriously limited or cannot perform any tasks requiring mental functioning.

The ALJ also addressed the consistency of the opinion, concluding it was inconsistent with other evidence in the record showing "few abnormal examination findings." Support for that conclusion is also borne out in the medical records. Ms. Fearing's primary care physician and the nurse practitioners in the practice prescribed Xanax for anxiety. (*See* Tr. 1339). Her physician did not always document Ms. Fearing's mental status, but when he did, his findings were typically normal. (*See, e.g.*, Tr. 1349 ("cognitive function intact, cooperative with exam"); Tr. 1356 ("alert, oriented, good eye contact, judgment and insight good")). Dr. Bauer and his nurse practitioner prescribed Vyvanse for attention and focus. (*See* Tr. 1027). His neurological examinations typically showed Ms. Fearing's attention and concentration were normal and her memory was intact. (*See* Tr. 1028, 1299, 1732, 1761, 1765-66, 1774, 1779, 1784, 2211). Thus, substantial evidence supports the ALJ's conclusion that the "few abnormal examination findings" are inconsistent with Dr. Sprout's opinion that Ms. Fearing is seriously limited or cannot perform any tasks requiring mental functioning.

Ms. Fearing also argues the ALJ's reliance on the prior ALJ's RFC to discount Dr. Sprout's opinion "is contrary to" *Earley,* "as set forth in the prior [a]rgument." (ECF #16 at PageID 2372).

Assuming Ms. Fearing is claiming the ALJ, in deciding that Dr. Sprout's opinion is not persuasive, simply adopted the prior RFC without giving the claim a "fresh look," her argument is meritless. The ALJ did not blindly adopt the prior RFC. She discussed Ms. Fearing's current impairments and mental health treatment. (Tr. 30). In doing so, the ALJ addressed both abnormal and normal mental status examination findings and adopted RFC restrictions to address those concerns.

I thus decline to order remand on this basis.

**III.  Symptoms Evaluation**

Last, Ms. Fearing argues the ALJ did not "articulate any supportable rationale" for finding the statements she made about the intensity, persistence, and limiting effects of her symptoms "not entirely consistent with the medical and other evidence" of record. (ECF #16 at PageID 2376). She contends her testimony and the statements she made about her symptoms are supported by the medical evidence and the ALJ "failed to account for [her] pain when forming the RFC." (*Id.* at PageID 2375).

In evaluating the claimant's subjective reports of symptoms, Social Security Ruling (SSR) 16-3p requires the ALJ to consider the claimant's complaints along with the objective medical evidence, treatment received, daily activities, and other evidence. 2017 WL 5180304, at *5-8 (Oct. 25, 2017). The ALJ also uses the factors outlined in 20 C.F.R. § 404.1529(c)(3) to evaluate the claimant's statements:

1.  A claimant's daily activities;

2.  The location, duration, frequency, and intensity of pain or other symptoms;

3.  Factors that precipitate and aggravate the symptoms;

4.  The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

40

5. Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

6. Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

7. Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ must analyze factors for which there is evidence in the record but need not analyze factors that are not relevant. SSR 16-3p, 2017 WL 5180304, at *8. The ALJ must explain which of an individual's symptoms are consistent or inconsistent with the evidence and how the ALJ's evaluation of the symptoms led to the ALJ's conclusions. *Id.*, 2017 WL 5180304, at *9. And the ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.*, 2017 WL 5180304, at *10. In other words, the ALJ's explanation of that assessment must be specific enough to permit the court to "trace the path" of the ALJ's reasoning. *Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005).

The ALJ documented Ms. Fearing's statements about her symptoms and determined her statements were not entirely consistent with the medical and other evidence:

> The claimant reported on that she could not stay in one position for more than an hour at a time; she was weaker on her right side; and she was tripping and dropping things. She has cramps and electric shock sensation in her legs, hips, and right arm. She also has severe anxiety, PTSD, bipolar disorder, and depression that limits her ability to be around more than 5 people at a time. She has symptoms in her back, neck, and hips. She has severe symptoms of Crohn's disease and migraine headaches, as well as insomnia. She drives a car, leaves the house on her own, shops in stores, and manages her own personal finances. The claimant reported limitations in lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing,

41

memory, completing tasks, concentrating, understanding, following instructions, using her hands, and getting along with others.

The claimant's son made similar reports.

The claimant testified that she has difficulty climbing stairs due to joint pain and breathing problems secondary to COPD. She has a GED and she can manage a bank account. She can drive, but sometimes she has others drive her places. She last worked in May of 2024, and she worked for three weeks at her last job. She stopped working due to increased pain and breathing problems. She cannot lift due to symptoms of Crohn's disease, deteriorating joints and breathing problems. She cannot perform lifting as a STNA. She also has anxiety and neck pain. She does not like being around others. She also has problems with her memory. She went to a wedding in Tennessee but had problems with anxiety around people. It was overwhelming. She has pain in all of her joints, lower back, and neck. She has numbness in her upper extremities, and she drops things without knowing it. She has some problems with her feet and toes and is scheduled for surgical intervention. She sees a psychiatrist and engages in individual therapy. She has tried physical and occupational therapy and medications. She can stand and walk for about one hour at a time, and she takes breaks with housework. She can sit for 60 to 90 minutes before she has low back and neck pain. She can lift a gallon of milk. She watches television alternating between sitting, walking, and lying down. She washes dishes, at times, and she takes care of a dog, but does not walk her. She also uses Facebook twice a month. She smokes 5-10 cigarettes per day. She has difficulty being in one spot too long, and she is in the restroom for 45 minutes per day, for eight times a day. This was a problem in her employment in the past.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

* * *

As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because her subjective reports are not fully supported by the objective findings and other evidence in the treatment records. The evidence shows that the claimant had improvement in her hips and knees with surgical intervention and treatment, she and her mental impairment symptoms had improved to the point that the claimant could return to substantial gainful activity. She reported that she was working as an STNA 12 hours per day and taking care of

42

family in October of 2023. Treatment notes from February 5, 2024, show that the claimant was currently employed as an STNA working full duty at that time.

The record shows that her Crohn's symptoms appear to be under control with intravenous Entyvio, although the claimant stopped taking the medication sometime prior to 2024.

The claimant testified that she had limitations in working due to difficulty breathing. However, treatment notes generally show that the claimant was breathing normally with no labored breathing or significant breathing problems on examination.

The claimant testified that she had limitations in working due to joint problems, including pain. Treatment notes show that the claimant has primary osteoarthritis involving multiple joints but was doing well with treatment. However, she did have pain with range of motion of the left knee in December of 2023. She also had Heberden's and Bouchard's nodes of her fingers, but imaging did not show any significant degenerative changes.

The claimant testified that she was also limited due to low back pain and neck pain. The record shows that the claimant reported chronic neck pain. An EMG/NCV study of the claimant's right upper extremity and right lower extremity, dated November 29, 2021, indicated mild to moderate right L5 radiculopathy and moderate right C6 radiculopathy. An MRI of the claimant's cervical spine, dated September 1, 2022, revealed mild broad-based disc bulge with facet hyper trophy at C5-C6 with mild left neural foraminal narrowing and mild spinal canal narrowing; and mild straightening of the normal cervical lordosis on lateral radiograph. An MRI study of the claimant's lumbar spine, dated May 21, 2022, revealed mild degenerative changes at L3-L4 and L4-L5 similar to a prior examination, asymmetric left greater than right sacroiliac joint degenerative changes. The claimant had findings of some pain with range of motion and intermittent findings of slightly reduced strength. This evidence supports limiting the claimant to light work with occasional postural activities, but frequent balancing, and no ladder rope or scaffold climbing as well as limited use of the bilateral lower extremities for operation of foot controls and frequent use of the bilateral upper extremities for reaching in handling.

The record shows that the claimant underwent Botox injections and reported no lasting relief. However, she also used gabapentin, muscle relaxers, and Norco; and was noted to be doing well in 2024. The record shows that the claimant was assessed with chronic migraine headaches in November 2021, and she was taking medication. This evidence further supports environmental limitations, as well as frequent manipulative limitations and lifting and carrying limitations.

(Tr. 24-25, 30-31) (citations omitted).

43

This discussion reflects the ALJ's comparison of Ms. Fearing's symptoms with the medical evidence, factors that aggravated her conditions, her response to the treatment she received, and her daily activities as instructed by SSR 16-3p and 20 C.F.R. **§§** 404.1529(c)(3)(v)-(vi). The ALJ acknowledged Ms. Fearing's reported pain and gastrointestinal symptoms but found the degree of those symptoms was not disabling as it was inconsistent with her ability to return to working 12-hour shifts as an STNA, the effects of medication on her gastrointestinal symptoms and migraines, objective medical evidence showing typically normal or minimally abnormal findings on physical examination, and mild-to-moderate findings on EMGs and MRIs. The ALJ supported that discussion with citations to evidence in the medical record. In addition to that evidence, Ms. Fearing's conversation with her nurse practitioner on July 3, 2024, is compelling evidence supporting the ALJ's conclusions. That treatment note reflects Ms. Fearing's desire to return to full-time employment, her report of being in "overall good health," and, relevant to her gastrointestinal symptoms, she reported "intermittent good days and bad days, albeit less severe than before." (Tr. 2297-98). Thus, the ALJ properly compared Ms. Fearing's statements with the appropriate factors and her conclusions are supported by substantial evidence.

I thus decline to order remand on this basis.

## CONCLUSION

After review of the record, the parties' arguments, and the law, I **AFFIRM** the

Commissioner's decision denying disability insurance benefits.

Dated: August 12, 2026

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

45